UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **HEATHER WYATT, as Administratrix of The Estate of Aubreigh Wyatt and HEATHER WYATT, INDIVIDUALLY AND AS PARENT/ GUARDIAN OF AUBREIGH WYATT** | **PLAINTIFF** |
| VS. | CASE NO: 1:25-CV-98 |
| **OCEAN SPRINGS SCHOOL DISTRICT, OCEAN SPRINGS BOARD OF TRUSTEES, OCEAN SPRINGS SCHOOL DISTRICT SUPERINTENDENT; OCEAN SPRINGS UPPER ELEMENTARY: TEACHERS A-Z, LUNCH AIDES A-Z, SCHOOL NURSES A-Z, LIBRARIANS A-Z, JOHN DOES 1-20; SCHOOL COUNSELORS A-Z, SCHOOL ADMINISTRATORS A-Z, And OCEAN SPRINGS MIDDLE SCHOOL: TEACHERS A-Z, LUNCH AIDES A-Z, SCHOOL NURSES A-Z, LIBRARIANS A-Z, JOHN DOES 1-20; SCHOOL COUNSELORS A-Z, SCHOOL ADMINISTRATORS A-Z** | **DEFENDANTS** |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR ORDER OF SUPPRESSION ("GAG ORDER")**

**REPLY**

Plaintiff's Opposition See Doc. 16 filed May 15, 2025, confirms the very dangers that necessitate a gag order in this case. The record shows that Plaintiff Heather Wyatt and those acting in concert with her have engaged in a relentless extrajudicial campaign targeting four minor children by name, blaming them for Aubreigh Wyatt's tragic suicide and inciting a wave of public hostility.

Plaintiffs' response concedes that Plaintiffs' online activities have resulted in threats of violence and retaliation to the Defendants. See Doc [16] ¶¶ 6-7. To minimize the impact of Plaintiffs' online activity, she argues that these events happened in the past and as such, there

should be no protection afforded to the Defendants and/or the minor children from the school allegedly involved with bullying.

Plaintiffs ignore the recent February 10, 2025 TikTok Video wherein Heather Wyatt states "**And guess what? There's still more to come**." See [Doc 8-3] at 2.  In March of 2025 only two months ago, Plaintiffs' daughter T.B.W.P. posted a video with photographs of the male minor student identified in the complaint along with his name.  That the video has now been taken down is for naught, the potential harm and prejudice after 35 million plus views can only be known once it becomes too late. To now claim no harm, no foul after 35 million views is disingenuous at best.

In her Opposition, Plaintiff does not seriously dispute that the minor children face harm. Instead, she raises legal arguments aimed at avoiding a gag order – arguments that misapply the First Amendment and ignore controlling Fifth Circuit standards. She even goes so far as to ask this Court to "immediately vacate" a Mississippi Chancery Court injunction that was issued to protect these same minors. Plaintiff's positions are meritless. As shown below, the law in this Circuit permits and indeed obligates the Court to restrict extrajudicial statements by parties when there is a substantial likelihood of material prejudice to the proceedings. That standard is amply satisfied here.

Moreover, Plaintiff's invocation of the First Amendment is misplaced because her conduct is not mere "public advocacy" on a matter of general concern, but targeted speech that has incited foreseeable threats and harassment against identifiable minors and school officials. No constitutional protection extends to such harmful extrajudicial conduct in the context of a pending case, especially where it endangers children and undermines the fairness of trial.

For these reasons and those set forth in our opening motion, Defendants – the Ocean Springs School District, its Board of Trustees, and the Superintendent – respectfully renew their request for a gag order.

The proposed order is narrowly tailored to protect compelling interests: safeguarding the minor children's safety and privacy, and preserving a fair, impartial adjudication free from undue outside influence. Doc [8] at 7. Plaintiff's Opposition not only fails to rebut the necessity of this relief; it underscores it.

We address Plaintiff's specific arguments in turn and urge the Court to (1) impose the requested suppression order and (2) adopt the additional measures described herein to ensure the order's effectiveness, including a bar on Plaintiff and her agents commenting on the existence or terms of the gag order itself.

## I. PLAINTIFF'S EXTRAJUDICIAL STATEMENTS HAVE HARMED MINOR CHILDREN AND THREATEN THE FAIRNESS OF THESE PROCEEDINGS

Protecting the Minor Children's Identities and Safety: Plaintiff's Opposition glosses over the grave harm her actions have caused to the four minor girls named in the Complaint's exhibits and social media posts. The reality – as documented in Defendants' motion and in an independent lawsuit by the minors' families – is that these children have been subjected to a torrent of abuse and threats as a direct result of Plaintiff's public commentary. In the wake of these posts, the minors and their families have received *"insulting and revolting messages from around the world,"* including death threats and vulgar taunts sexualizing these young girls. One minor's home address was even disseminated. These are not hypothetical or trivial injuries – they are concrete harms to real children. Absent court intervention, the continued public targeting of these minors will inflict

irreparable damage on their safety, emotional well-being, and ability to participate in this litigation without fear. Protecting minor children from such harassment is a paramount interest recognized by law.

Indeed, federal procedural rules mandate the privacy of minors in court filings (requiring use of initials instead of full names), underscoring that children's identities warrant special protection. Plaintiff has willfully flouted that principle by exposing the minors' identities to millions on social media. The requested gag order directly serves the compelling interest of shielding these children from further harm.

Preventing Prejudice to the Jury Pool and Integrity of the Trial: Plaintiff's public accusations and the ensuing media attention have also created a serious risk of tainting the jury pool and turning this case into a media spectacle. By Plaintiff's own design, her narrative of Aubreigh's death (and the alleged role of the four classmates and the School District) has reached an audience "world-wide" in scope, including countless residents of South Mississippi who are potential jurors. Through TikTok videos, Instagram posts, Facebook discussions, and even an article in *People* magazine arranged by Plaintiff, a one-sided and inflammatory account of the case has permeated the community. The content of Plaintiff's extrajudicial statements – accusing school officials of a cover-up and explicitly urging retribution against the minor "bullies" – is precisely the kind of material that *"create[s] a carnival atmosphere"* and *"impact[s] the jury venire"* in a deeply prejudicial way. Potential jurors exposed to this rhetoric may form fixed opinions about the case (or fear community backlash if they do not side with Plaintiff), undermining both Defendants' right to a fair trial and the Court's ability to conduct an orderly proceeding. In short, Plaintiff's conduct has already prejudiced the pool of prospective jurors and, if unchecked, will continue to do so. That is the textbook definition of a substantial threat to the integrity of the upcoming trial.

Plaintiff's Opposition notably fails to refute these facts. Instead, it argues that Defendants have shown only "generic and broad threats" not specifically tied to her conduct. The record proves otherwise. The threats are directly linked to Plaintiff's dissemination of the minors' names and her call for vigilante "justice." The minors who were named by Plaintiff *became* the targets of the ensuing harassment; the School District that Plaintiff vilified *received* bomb threats. There is nothing "generic" about death threats to particular children or a bomb scare at a specific school. These are targeted acts of intimidation prompted by Plaintiff's narrative, and they demonstrate exactly the "nexus between [Plaintiff's] comments and the potential for prejudice" that warrants a restraining order. Plaintiff cannot dodge responsibility by characterizing the fallout of her actions as abstract or unrelated. Courts have long recognized that when trial participants' speech causes real-world interference in the judicial process – be it by inflaming public sentiment or endangering witnesses – a gag order is not only permissible but necessary (see *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966), warning that courts must prevent *"partisan publicity"* and *"bedlam"* that threaten a fair trial). Here, Plaintiff's extrajudicial campaign has already done palpable damage.

Plaintiff's Violations of the Existing Injunction: Tellingly, Plaintiff and her agents have persisted in this misconduct despite an existing state court injunction aimed at curbing it. As Defendants noted in their motion, the parents of the four girls were *"forced to seek an emergency injunction"* in Chancery Court to halt the Wyatts' "campaign of terror" against their children. On July 1, 2024, a Chancery Court judge entered an order directing Plaintiff to temporarily shut down all her social media accounts "to protect the minor" victims. That extraordinary remedy was a direct response to the onslaught of threats and harassment unleashed by Plaintiff's postings. Yet, by her own admission, Plaintiff (or those working with her) has repeatedly disregarded that injunction. The Opposition all but concedes as much by asking this Court to vacate the Chancery

Court's order entirely. In other words, Plaintiff seeks a green light to resume the very behavior another court found so harmful that it ordered a social-media blackout.

Far from excusing Plaintiff, these circumstances weigh heavily in favor of a gag order in this matter. Plaintiff's defiance of the state court's mandate demonstrates that lesser restrictions have failed – she will not relent unless compelled by a new order from this Court. Furthermore, the fact that a Mississippi Chancery Judge saw fit to issue injunctive relief reinforces the severity of the problem. Defendants suggest the Court should not allow Plaintiff to evade the "logic of that injunction" simply because the School District (Defendants here) were not formal parties to the Chancery proceeding. The protective purpose of the state injunction was to shield the same minors who are entwined in this federal case; that purpose remains vital regardless of which parties are before this Court. In sum, Plaintiff's ongoing violations of the prior court order underscore the urgent need for *this* Court to intervene and put a stop to the extrajudicial commentary once and for all.

## II. A GAG ORDER IS WARRANTED UNDER THE FIFTH CIRCUIT'S "SUBSTANTIAL LIKELIHOOD OF PREJUDICE" STANDARD

Plaintiff's Opposition is predicated on the wrong legal standard. It argues that Defendants must satisfy the usual four-factor test for a preliminary injunction (likelihood of success on the merits, irreparable harm, balance of equities, public interest) and suggests that no injunction can issue unless Plaintiff's speech falls into a narrow category such as incitement or defamation. This is a misstatement of the law applicable to gag orders in pending cases. While traditional injunction factors often guide the analysis, gag orders aimed at trial participants are principally judged by a First Amendment-based standard: whether the party's extrajudicial statements pose a *"substantial likelihood of materially prejudicing the court's ability to conduct a fair trial."* Marceaux v.

*Lafayette City-Par. Consol. Gov't*, 731 F.3d 488, 493–94 (5th Cir. 2013) (citing *United States v. Brown*, 218 F.3d 415 (5th Cir. 2000)). The Fifth Circuit in *Marceaux* explicitly applied this "substantial likelihood of prejudice" test to a civil case, recognizing that *"the conflict between freedom of speech and the right to a fair trial is no less troubling in the non-criminal context."*. *Id*. at 494. In other words, when determining whether to restrict a litigant's speech, the central question is whether that speech is substantially likely to compromise the fairness, impartiality, or integrity of the proceedings. If so, a court has both the authority and the duty to impose an appropriate restraint, *provided the restraint is narrowly tailored to mitigating the identified prejudice*.

Defendants' motion clearly meets the requirements for the relief requested. The extensive evidence of prejudicial pretrial publicity and its effects (detailed in Part I above) establishes that Plaintiff's out-of-court statements create, at minimum, a substantial likelihood of prejudice to these proceedings. Indeed, it is difficult to imagine a stronger case for a gag order:

- Targeting of Key Witnesses/Parties: Plaintiff's statements have named and attacked individuals who are likely witnesses (the four minors) and have maligned the Defendants (the School District and its officials) with allegations that will be central at trial. This amplifies the risk that jurors will form opinions on credibility and fault before hearing any evidence in court. It also potentially intimidates witnesses from participating openly. Here, the nexus is direct and unambiguous – Plaintiff's commentary goes to the heart of the dispute and invites the public (and by extension, the jury pool) to pass judgment prematurely.

- Widespread Dissemination in the Jury Area: The magnitude of Plaintiff's social media dissemination (millions of views, including in the local community) far exceeds the kind

of isolated or obscure comment that might pose little risk. This case has become a cause célèbre in the region. When publicity is so pervasive, there can be little question that "tainting the jury venire" is squarely implicated.

- Inflammatory and Prejudicial Content: The substance of Plaintiff's speech is not a dry recitation of facts or a call for justice through the courts; it is a visceral appeal that labels certain children as villains and the Defendants as complicit, effectively trying and convicting them in the court of public opinion. The tone and timing of these statements (many coming post-filing of this lawsuit) indicate an intent to influence outcomes outside the courtroom. Defendants suggest that an online social media blitz during the pendency of this matter creates a *"circus-like atmosphere"* that threatens the proceedings' integrity.

Given these factors, the "substantial likelihood of prejudice" standard is not just met – it is exceeded. There is already concrete evidence of prejudice (e.g., community threats, needed security measures, potential juror exposure) in addition to the likelihood of future prejudice. Accordingly, the threshold for imposing a gag order is satisfied under Fifth Circuit law.

Even if the Court were to overlay the traditional Rule 65 injunction criteria (to the extent they apply in this context), Defendants would prevail on those as well. Irreparable harm is plainly shown: the erosion of a fair trial right and the endangerment of children are injuries that cannot be undone after the fact. No monetary remedy or corrective jury instruction can fully cure the kind of deep-seated community bias and fear that Plaintiff's campaign has fostered. As for likelihood of success on the merits, that factor is somewhat inapposite to a gag order (since we are not adjudicating the merits of Plaintiff's underlying claims here). However, if framed as the likelihood of succeeding on the motion (i.e., proving the need for a gag order), the evidentiary record strongly favors the Defendants, as explained above. The balance of equities tips decisively toward

protecting vulnerable minors and the judicial process over allowing Plaintiff unrestricted latitude to continue her public onslaught. And the public interest aligns with issuance of the gag order: the community is best served by a trial that is fair and based on evidence in court, not by a trial in the media that could lead to a miscarriage of justice. While the public does have an interest in open discussion of important issues like bullying, that interest does not extend to publicly shaming specific children or undermining court proceedings. In short, under any applicable standard, the relief Defendants seek is justified.

### III. PLAINTIFF'S FIRST AMENDMENT OBJECTIONS LACK MERIT – HER SPEECH IS NOT PROTECTED "PUBLIC ADVOCACY" WHEN IT INCITES HARM AND INTERFERES WITH JUSTICE

Plaintiff's Opposition leans heavily on the First Amendment, arguing that the proposed gag order would be an impermissible prior restraint because her speech does not fall into a traditionally unprotected category such as "incitement of imminent lawless action" or defamation. This argument mischaracterizes both the nature of Plaintiff's speech and the scope of First Amendment protection in this context. To be clear, Defendants assert that Plaintiff's ongoing conduct – speech that names and vilifies private minors involved in pending litigation, encourages retaliation against them, and broadcasts prejudicial allegations – can and should be restrained consistent with the First Amendment, due to the compelling interests at stake. The First Amendment does not give any litigant the license to irreparably damage the judicial process or to put minors in harm's way under the guise of "public advocacy."

It is important to distinguish between speech on matters of public concern in a general sense and speech that poses a serious threat to specific persons or to the fairness of a court proceeding. Plaintiff portrays her online commentary as protected advocacy about bullying and

school accountability, of interest to the community. Indeed, broad discussion on how schools handle bullying is certainly within the realm of public discourse. But Plaintiff's actual posts went well beyond abstract advocacy – they amounted to a targeted campaign against particular individuals (the four girls and school officials) with the foreseeable effect of unleashing harassment and vigilantism. This crosses a line. Here, Plaintiff's speech has already resulted in what are effectively *real-world threats and lawless actions* — anonymous individuals issuing death threats to children, mobs on social media vowing retribution, and at least one incident of a bomb threat to a school campus.

One need not stretch the doctrinal labels to see that Plaintiff's ongoing speech is *causing* and *inciting* harm, even if she did not explicitly command violence in the narrowest sense. The First Amendment does not protect speech that intentionally or recklessly triggers a likelihood of such imminent harm to others. Even the case Plaintiff cites, *Counterman v. Colorado*, emphasizes that "true threats" (statements where the speaker recklessly disregards the risk of causing fear of violence) fall outside First Amendment protection. See 600 U.S. 66, 143 S. Ct. 2106, 2114-15 (2023). By continuously singling out the minors and fueling public outrage against them, Plaintiff has either intended or at least recklessly disregarded the probability that unhinged actors would be moved to threaten or terrorize those children. That is not protected advocacy; it is dangerous conduct that the law can regulate.

Moreover, even setting aside the threats issue, Plaintiff's speech directly conflicts with the integrity of the judicial process, which is itself a paramount concern that can warrant speech restrictions. The Supreme Court has recognized that certain extrajudicial speech by trial participants may be restricted not because it is false or defamatory, but because it *interferes with the administration of justice*. See *Sheppard v. Maxwell*, 384 U.S. at 363 (a trial judge has the duty

to protect the trial from prejudicial outside influences). The Fifth Circuit similarly observed that an individual's First Amendment rights may be limited by court order in the context of both civil and criminal trials. The speech at issue here – Plaintiff's ongoing commentary about the parties, evidence, and blame – strikes at the heart of the adjudicative process. If allowed to continue, it risks turning the trial into a mere formality, as public opinion would have already cemented a narrative. The First Amendment does not require the courts to sit idly by and allow a litigant to poison the jury well before trial. On the contrary, when faced with such a conflict, courts *"must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences."* Sheppard, 384 U.S. at 363.

Plaintiff's Opposition also argues that her speech is protected because it addresses a topic of public interest (bullying in schools) and that the community "has a right" to the information she shares. We do not dispute that bullying prevention is an important public issue. But the manner in which Plaintiff is injecting information into the public realm is not protected by any notion of the public's right to know. Critically, much of the "information" Plaintiff has disseminated consists of allegations and case details that are *in dispute* and will be subject to proof (or disproof) at trial. Publicizing selective evidentiary materials or accusations – especially in a sensationalized fashion that identifies minors – is not necessary for the public's understanding of the broader issue. The public can be made aware that bullying is a serious problem and that Aubreigh's death is a tragedy calling for action *without* being told the names of specific 13-year-old girls alleged to be "bullies" or one-sided accounts of a pending lawsuit. Indeed, Plaintiff can continue to advocate for anti-bullying measures, support for victims, and policy changes in general terms even under the strictest gag order. What she *cannot* do (and should not have been doing) is litigate her case in the press

and rallying an online mob against those she blames. The First Amendment does not entitle her to that latter course, particularly when it endangers children and jeopardizes a fair trial for all parties.

Finally, to the extent Plaintiff suggests that an order here would be an unconstitutional "prior restraint," it must be noted that gag orders on trial participants are treated differently than censorship of outsiders or the press. The proposed order would bind *the parties and their agents*, who are before this Court and subject to its jurisdiction, based on a finding of substantial likelihood of prejudice. Such orders, when properly supported, have been routinely upheld against First Amendment challenge. They carry none of the hallmarks of censorship of public debate at large; rather, they are a judicial tool to regulate the proceedings over which the court has a duty to ensure fairness. In short, Plaintiff's First Amendment arguments fail because they ignore the compelling interests at hand and the well-established doctrine that speech causing serious and specific harm may be restricted narrowly to prevent that harm.

## IV. THE CHANCERY COURT INJUNCTION'S LOGIC APPLIES HERE, EVEN THOUGH DEFENDANTS WERE NOT PARTIES TO THAT CASE

Plaintiff contends that the Ocean Springs School District and its officials, having not been parties to the state Chancery Court injunction, cannot invoke that injunction now and that it should be vacated. This misses the point. Defendants are *not* asking this Court to "enforce" the Chancery Court's order as such; we are asking the Court to issue a federal gag order of its own. In doing so, it is entirely appropriate for this Court to consider the factual findings and rationale that led the Chancery Court to act. The underlying logic is identical: the need to stop Plaintiff from inflicting harm on minors through extrajudicial publicity. That need exists regardless of who sought the earlier injunction.

It is true that the School District was not a litigant in the Chancery Court proceeding. That injunction was pursued by the minors' parents for the benefit of their children. But notably, Plaintiff Heather Wyatt was the enjoined party in that order – just as she would be under the gag order sought here. She had notice and an opportunity to contest the state injunction, and she will have a full opportunity to contest any order of this Court (indeed, her Opposition is doing so). Thus, there is no unfairness in holding Plaintiff to consistent standards of conduct across both cases. If anything, Plaintiff's demonstrated disregard for the state injunction (as discussed above) gives this Court greater cause to enforce its own order strictly, because Plaintiff has shown a propensity to ignore judicial warnings.

Plaintiff's request that the Chancery injunction be "vacated" is not properly before this Court in any event. A federal district court has no authority to vacate or modify a state court's order in a separate proceeding; such relief, if desired, should have been sought via the state appellate process or modification in the issuing court. Plaintiff cites no legal basis that would allow this Court to simply nullify a state court's injunction, and we are aware of none. Her invitation for this Court to do so betrays a fundamental misunderstanding of jurisdiction and comity. It also reinforces a troubling inference: Plaintiff's priority is not to tailor the scope of injunctive relief appropriately – it is to eliminate *all* restraints so she can continue her media crusade unfettered. This Court should reject that approach. The prudent course is to issue a federal order that parallels the Chancery Court's protective intent (and perhaps extends it, as needed for this federal litigation) rather than dismantling the protections that exist.

In sum, the prior injunction obtained in Chancery Court offers a persuasive precedent that the situation at hand is dangerous enough to warrant gagging the Plaintiff's extrajudicial statements. While Defendants could not invoke that order directly, we urge the Court to give weight

to the Chancery judge's conclusion that Plaintiff's social media activity had to be halted *"to protect the minor children"* involved. The same protection is warranted here and now. The identities of the minors — which Plaintiff insists on publicizing — remain deserving of confidentiality and safety. The fact that a sister court intervened underscores that this is not a case of imagined harm; it is a case of ongoing harm that multiple courts can recognize and address within their respective proceedings.

## V. THE PROPOSED GAG ORDER IS NARROWLY TAILORED AND ADDITIONAL RELIEF IS WARRANTED TO ENSURE ITS EFFECTIVENESS

Plaintiff argues that Defendants' proposed gag order language is overbroad, characterizing it as an "all-encompassing restriction" on her First Amendment rights. This is a mischaracterization. In crafting the suppression order, Defendants have narrowly targeted the specific evils that need addressing: (a) the identification of or discussion about the minor children involved (by name or other personal details); (b) the public dissemination of case evidence or allegations in a manner likely to influence the jury pool; and (c) speech that incites or encourages others to threaten, harass, or harm any participants in this case. The proposed order does not bar Plaintiff from speaking about school bullying in general terms, from mourning her daughter, or from advocating for policy changes. It leaves untouched any speech that does not risk prejudicing this litigation or endangering its participants. In short, it demands restraint only as to the *case-specific communications* that have proven so problematic. This tailoring aligns with what the law requires. See *Marceaux*, 731 F.3d at 495 (vacating overbroad order and instructing that any gag must be limited to statements posing a substantial likelihood of prejudice). Our proposal hones in on those prejudicial statements and is therefore properly calibrated to the harms at issue.

To illustrate, if the gag order is entered, Plaintiff would be prohibited from, for example, posting on TikTok that *"[Minor Child's name] bullied my daughter and is a murderer – everyone make sure she faces consequences,"* or from publishing snippets of confidential school records or testimony on Facebook. Those are precisely the kinds of statements that need to be restrained. However, Plaintiff could still speak in public forums or online about the need for stronger anti-bullying programs, could still honor Aubreigh's memory and advocate for kindness, and could even report that she has filed a lawsuit (without delving into inadmissible specifics or naming minors). This leaves ample room for her to exercise free expression on issues of public importance, without allowing her to contaminate the jury pool or incite vigilantism. We believe this represents the least restrictive means to achieve the government's compelling interests here.

Plaintiff's claim that Defendants "failed to show or allege any factors" justifying a so-called "blanket prohibition" is simply wrong. The factors justifying the order – protecting minors, preventing witness intimidation, avoiding a tainted jury – are all over the record and have been discussed at length above. And again, the order sought is not a blanket ban on Plaintiff ever speaking; it is a context-specific, temporary restriction tied to this litigation. Once the trial is concluded (and any danger of prejudice has passed), the gag order will expire by its own terms. The narrowly drawn duration and scope further demonstrate the tailoring.

### ADDITIONAL RELIEF – NON-DISCLOSURE OF THE GAG ORDER ITSELF

Defendants also respectfully request that the Court include a provision in the suppression order prohibiting Plaintiff and her agents from commenting publicly about the existence or contents of the gag order. We recognize this is an extra step, but it has become necessary in light of Plaintiff's tactics. If such a provision is not included, there is a substantial risk that Plaintiff will attempt an end-run around the order by portraying herself as a martyr of "silencing" – potentially

galvanizing her followers to continue the very behavior the order seeks to stop. For instance, without a non-disclosure clause, Plaintiff could go on social media and say: *"The School District got a gag order against me – they don't want the truth out!"* Such a statement would be calculated to inflame public sentiment and invite speculation (or even open defiance) regarding the case, thereby defeating the purpose of the gag. Courts have authority to issue orders necessary to effectuate their judgments, and preventing a party from indirectly nullifying a gag order through meta-commentary falls within that authority. This additional restriction would be narrowly focused: its sole aim is to prevent the dissemination of the fact of the gag order in a prejudicial manner. It would not stop Plaintiff from communicating privately with her counsel about the order, or from challenging it through legal channels. It merely bars using the *existence* of the gag as a new rallying cry on the internet.

Defendants submit that including such a clause is appropriate here given Plaintiff's history of using every tool at her disposal (including court filings and orders, which she has posted online before) as fodder for her campaign. While this is an uncommon measure, these are uncommon circumstances. The Court's goal should be to *truly* pause the extrajudicial trial of this case in the media. That goal could be undermined if Plaintiff is allowed to publicize the gag order and spin it as further evidence of a cover-up or persecution. In the interest of completeness, we note that any First Amendment interests in announcing the gag order's existence are minimal and are outweighed by the same compelling interests discussed above. The public will learn the outcomes of this case *in court*, which is where it properly should.

**CONCLUSION**

Plaintiff's Opposition offers no persuasive reason to deny the gag order – if anything, it reinforces why such relief is imperative. The unchecked naming and shaming of minor children,

the blatant violation of a prior court's injunction, and the ongoing prejudicial media storm all point to one conclusion: the Court must step in to protect the rights of all parties (and non-parties) to a fair and safe legal process. The Fifth Circuit standard of substantial likelihood of prejudice is met by the extensive record of threats and publicity, and the First Amendment poses no barrier to an appropriately tailored order in these circumstances. Defendants therefore respectfully urge the Court to grant the Motion for Order of Suppression in full. We ask that the Court enter a gag order incorporating language to (a) forbid Plaintiff, her counsel, and those in active concert with them from making any public statements (including social media posts or media comments) that identify or discuss the minor children involved or disseminate information about this case likely to influence the jury or incite threats, and (b) prohibit any public commentary about the gag order itself. Such an order will safeguard the minor children's welfare, preserve the integrity of the jury pool, and ensure that this case is tried in the courtroom on the evidence – not on the internet via inflammatory allegations.

                                              OCEAN SPRINGS SCHOOL DISTRICT, OCEAN SPRINGS BOARD OF TRUSTEES, OCEAN SPRINGS SCHOOL DISTRICT SUPERINTENDENT

                                              BY: /s/ *Steven L. Lacey*
                                                    Steven L. Lacey

Steven L. Lacey, MSB # 99888
Sherman & Lacey, LLP
P.O. Box 2681
Madison, MS 39130
Tel: 601-750-3415
slacey@shermanlaceylaw.com

## CERTIFICATE OF SERVICE

      I, Steven L. Lacey, certify that I have this day forwarded a copy of the foregoing pleading via the electronic mailings and/or United States Postal Service to all counsel of record registered to receive such notices.

      This the 23rd day of May, 2025.

                                        /s/ *Steven L. Lacey*
                                        Steven L. Lacey

Case 1:25-cv-00098-TBM-RPM     Document 18     Filed 05/23/25     Page 18 of 18